Pack Brothers Body Shop, Inc. v. Nationwide Mut. Ins. Co., 2003 NCBC 1

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| GASTON COUNTY | 01 CVS 805 |

PACK BROTHERS BODY SHOP, INC., a )
Corporation, and RONNIE PACK, an )
individual, )
                                )
    Plaintiffs, )
                                ) **ORDER REGARDING DEFENDANTS'**
v.                      ) **SUMMARY JUDGMENT MOTION**
                                )
NATIONWIDE MUTUAL INSURANCE )
COMPANY, a corporation, a.k.a. )
NATIONWIDE INSURANCE )
ENTERPRISE and JOE BENKENDORF, )
Individually and as agent of NATIONWIDE )
INSURANCE COMPANY, )
                                )
    Defendants. ))

{1}      This matter is before the Court on Nationwide Mutual Insurance Company and Joe Benkendorf's ("defendants") motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. Defendants have moved for summary judgment on the following claims: tortious interference with contractual relations, tortious interference with prospective commercial advantage, unlawful steering under N.C. GEN. STAT. § 58-3-180 (2002), fraud, libel *per se* and *per quod*, slander *per se* and *per quod*, commercial disparagement, unfair and deceptive acts and practices pursuant to North Carolina's Unfair Trade Practices Act, N.C. GEN. STAT. § 75-1.1 - 89 (2001) ("UTPA"), and punitive damages. The Court considered defendants' motions and briefs, plaintiffs' responses, and oral argument held on December 9, 10, and 11, 2002. During oral argument, plaintiffs stipulated that their claims for tortious interference, unlawful steering, fraud, and commercial disparagement claims were all subsumed under their claim for unfair trade practices. The Court thus views defendants' summary judgment motion regarding those claims as MOOT. As to the remaining claims, for the reasons set forth below this court will:

1.  GRANT defendants' motion for summary judgment as to the libel *per se* claims of Pack Brothers Body Shop, Inc. and Ronnie Pack;

2.  GRANT defendants' motion for summary judgment as to the libel *per quod* claims of Ronnie Pack;

3.  DENY defendants' motion for summary judgment as to the libel *per quod* claims of Pack Brothers Body Shop, Inc.;

4. DENY defendants' motion for summary judgment as to slander *per se* and *per quod* claims of Ronnie Pack and Pack Brothers Body Shop, Inc.;

5. DENY defendants' motion for summary judgment as to the UTPA claims;

6. DENY defendants' motion for summary judgment as to plaintiffs' demand for punitive damages; and

7. Hold that defendants' motion for summary judgment as to the claims of the partnership, Pack Brothers Paint and Body Shop, Inc. are MOOT.

*Brooks Law Office, by Joyce M. Brooks for plaintiffs.*
*Law Offices of David Phillips, by David A. Phillips for plaintiffs.*
*Robinson & Elliott, by William C. Robinson for defendants.*
*Nelson Levine de Luca & Horst, by Adam S. Levy and Craig A. Cohen for defendants.*

## I. BACKGROUND

{2} This case arose out of a dispute between Nationwide Mutual Insurance Company ("Nationwide") and Pack Brothers Body Shop, Inc. ("Pack Brothers") over repair costs and rates charged by Pack Brothers. In 1999, tensions between Pack Brothers and Nationwide culminated in a confrontation between Ronnie Pack and Joseph Benkendorf, a Nationwide employee. Nationwide subsequently prohibited its employees from entering Pack Brothers property. As a result of this policy, Nationwide customers could not have their vehicles appraised by a Nationwide adjuster while the vehicles were on Pack Brothers property. Nationwide informed its customers in writing and orally that there would be some difficulties associated with choosing Pack Brothers to repair their vehicles. By February 2001, the relationship between Nationwide and Pack Brothers had further deteriorated. Ronnie Pack and Pack Brothers filed this suit on February 23, 2001 alleging that Nationwide and Joseph Benkendorf are liable on the following theories: libel, slander, tortious interference, fraud, commercial disparagement, unfair and deceptive trade practices and illegal steering.

## II. SUMMARY JUDGMENT STANDARD

{3} Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. *See* N.C. R. CIV. P. 56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995) (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact"). As moving parties, defendants have "the burden of

showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26; *see also Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993). In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor." *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999); *see also Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996).

{4}     Once the moving party shows that the plaintiff is unable to prove an essential element in the plaintiff's case, the burden shifts to the plaintiff to make a contrary showing. *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 63, 414 S.E.2d 339, 341 (1992). To defeat a motion for summary judgment, the non-moving party may not rely on the mere allegations in the pleadings. *Nicholson v. County of Onslow*, 116 N.C. App. 439, 441, 448 S.E.2d 140, 141 (1998). A response must describe specific facts showing that a genuine issue of fact exists for the trial. *Culler v. Hamlett*, 148 N.C. 389, 392, 559 S.E.2d 192, 194 (2002). If the plaintiff fails to make this contrary showing, the defendant is entitled to summary judgment. *Id*. at 148 392, 559 S.E.2d at 194.

### III.  DEFAMATION CLAIMS

{5}     "The term defamation includes two distinct torts, libel and slander. In general, libel is written while slander is oral." *Tallent v. Blake*, 57 N.C. App. 249, 251, 291 S.E.2d 336, 338 (1982). To recover under a defamation theory, a plaintiff must "allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Boyce & Isley, PLLC v. Cooper*, 2002 N.C. App. LEXIS 1088, 568 S.E.2d 893, 898 (2002) (internal citations omitted).

### III.A.  LIBEL

{6}     North Carolina recognizes three classes of libel: "(1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*." *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984), *rehearing denied*, 310 N.C. 749, 315 S.E.2d 704 (1984), *cert. denied*, 469 U.S. 858, 83 L. Ed. 2d 121 (1984).

{7}     **Libel *Per se.*** Libel *per se* is "a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to

impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Renwick*, 310 N.C. at 317-18, 312 S.E.2d at 408-9 (internal citations omitted). Whether a publication is of the type that properly may be deemed libelous *per se* is a question of law to be decided initially by the trial court. *See, id.* at 317-18 ("defamatory words to be libelous *per se* must be susceptible of *but one meaning* and of such nature that *the court* can presume *as a matter of law* that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." (internal citations omitted) (emphasis in original)).

{8}     In *Ellis v. Northern Star Co.*, the plaintiff company, Ellis Brokerage Company, Inc. ("Ellis"), was a food broker. *Ellis v. Northern Star Co.* 326 N.C. 219, 388 S.E.2d 127 (1990).   As a food broker, it was the company's function "to convince large quantity food buyers, such as hospitals and schools systems, to place orders with the company's clients who are in the business of selling foods." *Id.* at 221, 388 S.E.2d at 128.   The defendant, Northern Star Company ("Northern") was a potato processor for which Ellis was a broker. *Id.* at 221, 388 S.E.2d at 129.   Subsequently, Ellis received Northern's pricing information via telephone and sent price lists based on this information to several potential buyers. *Id.* at 222, 388 S.E.2d at 129.   A few months later, Northern terminated its brokerage contract with Ellis; Northern subsequently wrote the following letter to several of the buyers who had received the price list from Ellis:

> We have recently received copies of a price list sent to you from Ellis Brokerage Company regarding pricing on Northern Star potato products. These prices were noted for *bids only*, delivered by Northern Star.
>
> We at Northern Star Company did not authorize such a price list and therefore cannot honor the prices as quoted on June 23, 1986.

*Ellis*, 326 N.C. at 222, 388 S.E.2d at 129 (emphasis in original).

{9}     The North Carolina Supreme Court held that the letter constituted libel *per se* and stated:

> The language "[w]e at Northern Star did not authorize such a price list," taken in the context of the entire letter, can only be read to mean that Ellis Brokerage Company, acting in its capacity as broker for Northern Star, did an unauthorized act.  Whether that act was publishing certain unauthorized prices within a price list or publishing the entire price list itself without authorization is of no import; either reading is defamatory and impeaches Ellis Brokerage in its trade as a food broker.

*Id.* at 224, 388 S.E.2d at 130.

{10}     The North Carolina Court of Appeals had the opportunity to apply the holding in *Ellis* in *Martin Marietta v. Wake Stone Corp*., 111 N.C. App. 269, 432 S.E.2d 428 (1993).   In 1989, Martin Marietta

began the process of locating and opening a rock quarry in the same county where Defendant Wake Stone's rock quarry was located. *Id.* After receiving conditional permits from the Division of Land Resources of the North Carolina Department of Environment, Health, and Natural Resources, Martin Marietta requested a zoning variance from the county board of commissioners. *Id.* Wake Stone prepared a document for the county board of commissioners detailing the sequence of events leading to Martin Marietta's acquisition of permits, which purported to demonstrate that Martin Marietta received special treatment. *Id.* The document stated:

> 1. Martin Marietta received a mining permit dated March 26, 1990. The permit was issued by Steve Conrad, Director of the Division of Land Resources. A Division of the Department of Environment, Health and Natural Resources. The department may deny a permit request upon finding ...:
>
> "(3) That the operation will violate standards of air quality, surface water quality, or ground water quality . . . ."
>
> Specifically, the department requires a number of additional permits, which in this case includes a NPDES water discharge permit and a NSPS air pollution discharge permit. Neither of these permits have been issued and are not expected for at least 30 days.
>
> How can the land resources department issue a mining permit before they know whether an operation will meet the criteria of Item 3 above?
>
> Per Tracy Davis, acting mining specialist, it has become standard practice to issue the permit before air and water permits, with the company being notified that the permit is only valid upon the receipt of those additional permits.
>
> Martin Marietta presented the mining permit to Marvin Pridgen and requested a land use permit for its quarry preparation knowing that the permit was not valid until the other permits were received. The land use permit was issued but due to wet weather no work has yet begun.
>
> It should be noted that the permit was specially handled by Steve Conrad, bypassing Tracy Davis, at the request of John Long, Vice President of Martin Marietta and a member of the North Carolina State Mining Commission. Mr. Conrad retires from state government on Friday, March 30, 1990.
>
> The permit usually takes 30 days to be issued following the resolution of all pending matters. In this case the pending matter was the environmental assessment study requested of Martin Marietta. This issue was resolved by a letter from the Attorney General's office to Steve Conrad dated Friday, March 23, 1990. On the following Monday the permit was drafted, typed, reviewed, reclamation bond posted, approved and signed by Mr. Conrad. (Note: be sure to see attached copies of relative information from the Martin Marietta file including a draft of the condition resolving the use of public

funds for the project, a.k.a. the environmental assessment issue -- the draft was written by Steve Conrad).

2. The county is concerned about being sued by Martin Marietta for their vested interest in the quarry location. Per Mr. David Owens at the Institute of Government in Chapel Hill . . . , an entity does not have a vested interest until all permits are received. Then their vested interst [sic] becomes expenditures from that time forward. Not prior expenditures. From an explanation of the facts of the permitting versus zoning situation Mr. Owens stated that there was definitely no clear cut case which would set precedence. The issuance by the county of the land use permit could be the most damaging event so far. Only the prompt revocation of that permit would stop any vested interests (expenditures) from accruing.

3. Wake Stone Corporation was told by Marvin Pridgen that when it had all its permits, it could get a land use permit from the county. The mining permit was issued November 1, 1989. All other permits were received just prior to Christmas, 1989. A land use permit was applied for and received in January, 1990. Land preparation could have begun almost three months earlier.

4. Wake Stone Corporation does not expect the commissioners to handle their competition for them. However, we believe it only fair that all applications by industry be handled fairly and in the same manner, not in a way which can be bypassed by political influence or pressure. We believe the voters, taxpayers and all citizens would expect the same manner of conduct.

*Martin Marietta*, 111 N.C. App. at 273-74, 432 S.E.2d at 430-32.

{11}     After the commissioners denied Martin Marietta's application for a zoning exemption and revoked its land use permit, Martin Marietta sued for libel and unfair and deceptive trade practices. *Id.* at 275, 432 S.E.2d at 432. The trial court awarded summary judgment to defendant. *Id.* The Court of Appeals, upheld the trial court as to the libel claims, holding that the document was not libel *per se.* Judge Orr, writing on behalf of the Court of Appeals panel, distinguished the statements in Wake Stone's letter from the letter in Ellis as follows:

> Unlike the language in the present case, the language in *Ellis* which the Court determined constituted libel *per se* directly charged that the plaintiff company had committed an unauthorized act, no matter how the language was interpreted, and it impeached the company in its business as a food broker by potentially affecting its business relationship with buyers. In the present case, the language in the Document does not directly charge plaintiffs with an unauthorized act, or with improper, unlawful or unethical acts or practices as plaintiffs alleged. Further, the record contains no evidence to show that the language in the Document "impeached" Martin Marietta in its business of mining.
>
> Accordingly, we find that plaintiffs' reliance on *Ellis* is unfounded and affirm the decision of the trial court granting defendants' motion for summary judgment as to plaintiffs' claim for libel.

*Martin Marietta*, 111 N.C. App. at 280, 432 S.E.2d at 435.

{12}    In the case before this Court, plaintiffs ask the Court to find the following language contained in a letter from Nationwide to some of its customers libelous *per se*:

> Nationwide understands that you desire for Pack Brothers Paint & Body Shop to repair your vehicle. Nationwide respects the right of any customer to make an independent choice with respect to a body shop.
>
> However, recently we have refrained our employees from visiting Pack Brothers based on representations made to us by Pack Brothers. Since our employees [sic] safety and welfare is paramount to us, along with customer satisfaction, we will not be able to inspect your automobile on Pack Brothers premises.[1]

{13}    When determining if the statements are defamatory on their face, the Court must view the alleged statement in isolation, stripped of all explanatory circumstances, in the way "ordinary men naturally understand" the statement, ignoring the way "supersensitive persons with morbid imaginations" may view the statement. *Flake v. Greensboro News Co*., 212 N.C. 780, 786, 195 S.E. 55, 60 (1938). The Court finds that the language in Nationwide's letter is more like the language in *Martin Marietta* than the language in *Ellis*. The words in Nationwide's letter are subject to more than one interpretation. The language in the letter does not directly charge plaintiffs with an "unauthorized act, or with improper, unlawful or unethical acts or practices . . . ." *Martin Marietta*, 111 N.C. App. at 280, 432 S.E.2d at 435. One interpretation of the safety language is that Pack Brothers had an unsafe condition on the premises that the Pack Brothers had warned Nationwide about; alternatively, Nationwide could have instituted a policy of not sending Nationwide employees onto the premises of any body shop that has a certain kind of machinery. Testimony of recipients indicates that they were "confused" by the language and "didn't understand" it. Thus, as a matter of law, the language is not defamatory on its face.

{14}    Furthermore, plaintiffs have brought forward no evidence that defendants impeached the business of Pack Brothers Body Shop, Inc. The letter is not "necessarily hurtful" to the business. *See Farmer v. Lowe's Companies, Inc.,* 188 F.Supp.2d 612, 616 (W.D.N.C. 2001) (citing *Market America, Inc. v. Christman-Orth*, 135 N.C. App. 143, 151, 520 S.E.2d 570, 577 (1999)). The record is devoid of evidence suggesting that recipients of the letter selected another repair shop based solely on the letter.

{15}    To assert a libel *per se* claim as an individual, Ronnie Pack must also prove that the statement is "of or concerning" him; that the words must reflect on a particular individual. *Chapman v. Byrd*, 124 N.C. App. 13, 16, 475 S.E.2d 734, 737 (1996). The North Carolina Supreme Court defined this element by stating: "In order for defamatory words to be actionable, they must refer to some ascertained or

ascertainable person and that person must be the plaintiff. If the words used contain no reflection on any particular individual, no averment can make them dafamatory [sic]." *Id.* (quoting *Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979)).

{16}    Ronnie Pack's name is not contained in any of the alleged defamatory statements. To support Ronnie Pack's libel claim, plaintiffs have asked the Court to recognize a theory not yet adopted in North Carolina. Namely, that an individual has a defamation claim if their name is highly identified with the company and the individual is the company in the eyes of the public. *See, e.g., Desnick v. American Broadcasting Co.*, 1996 U.S. Dist. LEXIS 4914 (N.D. Ill.) (holding that the use of the owner's name in both an eye center's name and a surgical center's name created a likelihood that the audience would believe that the eye center was involved in equipment rigging even though it was never specifically named in the broadcast). The Court does not believe North Carolina will or should adopt such a theory. The libel *per se* claims of the business have failed; the libel *per se* claims of an individual highly identified with the business cannot survive on their own.

{17}    For the aforementioned reasons, the Court GRANTS defendant's summary judgment motion as it pertains to the libel *per se* claims of Pack Brothers and Ronnie Pack.

{18}    **Libel *Per quod.*** Unlike libel *per se*, the two categories of libel *per quod* require reference to acts or circumstances outside of the alleged libelous statement. In the first category of libel *per quod*, the publication is not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances the publication becomes libelous, it becomes defamatory. *See Aycock v. Padgett*, 134 N.C. App. 164, 167, 516 S.E.2d 907, 910 (1999). North Carolina recognizes a second, middle tier of libel where publications are susceptible of two interpretations one of which is defamatory and the other not. *Id.* This type of libel requires a plaintiff to prove that the defendant intended a defamatory meaning and that the recipients or readers understood the statement in a defamatory way. *Robinson v. Nationwide Ins. Co.*, 273 N.C. 391, 394, 159 S.E.2d 896, 899 (1968) (citing *Wright v. Credit Co.*, 212 N.C. 87, 192 S.E. 844 (1937)).

{19}    The case of *Tyson v. L'Eggs Products, Inc.* provides further guidance on libel *per quod* allegations:

> Whenever an allegedly defamatory publication is ambiguous or capable of a meaning other than the obvious one, it is for the jury to determine how it was understood by the recipient. However, it is the province of the court to determine in the first instance whether a communication is *capable* of a defamatory meaning. *Bell v. Simmons*, 247 N.C. 488, 495, 101 S.E. 2d 383, 388 (1958). In determining whether a published article is libelous, it must be read and considered in its setting. *Yancey v. Gillespie*, 242 N.C. 227, 230,

87 S.E. 2d 210, 212 (1955). The circumstances of the publication are pertinent, as well as the hearers' knowledge of facts which would influence their understanding of the words used. *Oates v. Wachovia Bank and Trust Co.*, 205 N.C. 14, 17, 169 S.E. 869, 871 (1933).

*Tyson v. L'Eggs Products, Inc.,* 84 N.C. App. 1, 13, 351 S.E.2d 834, 841 (1987) (emphasis in original).

{20}    The Court is not yet in a position to rule that, as a matter of law, the letters are not capable of defamatory meaning as to Pack Brothers. Plaintiffs have submitted sufficient evidence to survive summary judgment as to this element. However, the letters are not capable of a defamatory meaning as to Ronnie Pack individually. The Court declines to adopt plaintiffs' highly identifiable theory. Pack Brothers is run by three individuals, all of whom share the surname of Pack, yet only one is named as a plaintiff. Even if this Court thought North Carolina wished to adopt this theory, this case is not the appropriate vehicle to do so.

{21}    Thus, defendants' summary judgment motion as to Ronnie Pack's libel *per quod* claim is GRANTED and the motion as to Pack Brothers is DENIED.

### III.B.  SLANDER

{22}    Slander consists of spoken defamatory statements and there are two categories – slander *per se* and slander *per quod*. "Slander *per se* is an oral communication to a third person which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." *Phillips v. Winston-Salem/Forsyth County Board of Education,* 117 N.C. App. 274, 277, 179 S.E.2d 319, 323 (1971) (citing *Raymond U v. Duke University,* 91 N.C. App. 171, 371 S.E.2d 701*, disc. review denied*, 323 N.C. 629, 374 S.E.2d 590 (1988); *Morris v. Bruney,* 78 N.C. App. 668, 338 S.E.2d 561 (1986).)   Slander *per quod* involves a spoken statement of which the harmful character does not appear on its face as a matter of general acceptance, but rather becomes clear "only in consequence of extrinsic, explanatory facts showing its injurious effect . . . ." *Donovan v. Fiumara,* 114 N.C. App. 524, 527, 442 S.E.2d 572, 574-75 (1994) (quoting *Badame v. Lampke*, 242 N.C. 755, 757, 89, S.E.2d 466, 467-68 (1955)).

{23}    There is evidence in the record that an insurance agent with Nationwide falsely accused Ronnie Pack of brandishing a gun while a Nationwide adjuster was on Pack Brother's premises. Nationwide has brought forth evidence that may indicate the agent was an independent contractor and not an employee of Nationwide. Such evidence includes the testimony of the agent and the contract between the agent and Nationwide. The North Carolina Supreme Court has enunciated the factors that may be relevant to determining whether a particular individual is an employee or an independent contractor:

> The person employed (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time. . . . The presence of no particular one of these *indicia* is controlling. Nor is the presence of all required. They are considered along with all other circumstances to determine whether in fact there exists in the one employed that degree of independence necessary to require his classification as independent contractor rather than employee.

*Hayes v. Board of Trustees*, 224 N.C. 11, 16, 29 S.E.2d 137, 140 (1944) (internal citations omitted).

{24}     Given the state of the record before it, the Court is not in a position to rule as a matter of law that the agent's statements can or cannot be imputed to Nationwide. Additionally, plaintiffs have presented evidence that some Nationwide employees told customers that: (1) Pack Brothers cheats people; (2) Pack Brothers is unreliable; (3) Pack Brothers overcharges; (4) Pack Brothers is unprofessional; (5) Pack Brothers does poor work; (6) Pack Brothers is slow; and (7) Pack Brothers will not stand behind their work. Plaintiffs have put forth some evidence that similar statements were made about Ronnie Pack individually. Thus, plaintiffs have presented sufficient evidence to survive a summary judgment ruling on Ronnie Pack's individual slander claims. Therefore, defendants' summary judgment motion on the slander claims of Ronnie Pack and Pack Brothers is DENIED.

### III.C.  PRIVILEGE

{25}     Assuming, *arguendo*, this Court were to find that defendants' actions were defamatory, its analysis does not stop. Defendants may demonstrate privilege as a defense. *See Market America*, 135 N.C. App. at 150, 520 S.E.2d at 576; *DiamlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 583, 561 S.E.2d 276, 284-85 (2002). A qualified privilege exists when a communication is made:

> (1) on subject matter (a) in which the declarant has an interest, or (b) in reference to which the declarant has a right or duty, (2) to a person having a corresponding interest, right, or duty, (3) on a privileged occasion, and (4) in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

*DiamlerChrysler,* 148 N.C. App. at 583, 561 S.E.2d at 285 (quoting *Phillips v. Winston-Salem/Forsyth County Bd. Of Educ.,* 117 N.C. App. 274, 278, 450 S.E.2d 753, 756 (1994)).

{26}     "The essential elements for the qualified privilege to exist are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a manner and [to]

the proper parties only." *Id.* (quoting *Long v. Vertical Technologies, Inc.*, 113 N.C. App. 598, 602, 439 S.E.2d 797, 800 (1994)). "Whether a communication is privileged is a question of law for the court to resolve, unless a dispute concerning the circumstances of the communication exists, in which case it is a mixed question of law and fact." *Id.* (quoting *Market America*, 135 N.C. App. at 150, 520 S.E.2d at 576). Where the privilege exists, a presumption arises "that the communication was made in good faith and without malice." *Id.* (quoting *Phillips,* 117 N.C. App. 274, 278, 450 S.E.2d 753, 756 (1994)). To rebut this presumption, the plaintiff must show actual malice or excessive publication. *Id.* (quoting *Harris v. Procter & Gamble*, 102 N.C. App. 329, 401 S.E.2d 849 (1991)); *Bouligny, Inc. v. Steelworkers,* 270 N.C. 160, 154 S.E.2d 344 (1967); *Raymond U,* 91 N.C. App. 171, 371 S.E.2d 701.

{27}    *Williams v. State Farm Mut. Auto. Ins. Co.* holds that an insurance company has "a legitimate business interest in getting automobiles which it insured repaired correctly and for the lowest price." *Williams v. State Farm Mut. Auto. Ins. Co.* 67 N.C. App. 271, 277, 312 S.E.2d 905, 909 (1984). Defendants have asked this Court to adopt the holding in *Williams* to find that an insurance company has an absolute privilege even as it relates to defamatory conduct. This Court does not believe that our Court of Appeals intended its holding regarding interference with contract to spill into the defamation arena as an absolute privilege. The Court of Appeals found only a protectable interest. The elements necessary to finding a qualified privilege include more than a protectable interest; the elements include limiting the scope of the statement to the protectable interest, good faith, and limited publication. *See DiamlerChrysler,* 148 N.C. App. at 583, 561 S.E.2d at 285.

{28}    It is not yet clear from the record that defendants had a qualified privilege. As stated in *Williams,* Nationwide has a protectable interest in getting automobiles it insures repaired correctly and for the best price and ensuring the safety of its employees. Whether the letters and statements at issue were limited in their scope, whether the defendants had a good faith belief that its actions were necessary to protect its interest, and whether defendants limited publication of its statements is not clear from the current record. Plaintiffs have presented some evidence that good faith was missing.

### III.D. DAMAGES

{29}    The two actionable classes of defamation, *per se* and *per quod*, include a requirement that the plaintiff be injured. In a *per se* action, "malice and damage are, as a matter of law, presumed . . . ." *Donovan v. Fiumara,* 114 N.C. App. 524, 527, 442 S.E.2d 572, 574-75 (1994) (internal citations omitted). In a *per quod* action, "the injurious character of the words and some special damage must be pleaded and proved." *Id.* Special damage means pecuniary loss; emotional distress and mental suffering alone are not sufficient. *Id.* Whether plaintiffs ultimately will be able to show that Ronnie Pack suffered

pecuniary damages as an individual or that Pack Brothers sustained pecuniary damages is not evident from the record before the Court. However, plaintiffs have presented some evidence of those damages and as a result, summary judgment for defendants would not be proper.

{30}    In summary, defendants are GRANTED summary judgment as to the libel claims of Ronnie Pack. Defendants are GRANTED summary judgment as to the libel *per se* claims of Pack Brothers. Plaintiffs have presented some evidence to support the libel *per quod* claims of Pack Brothers and the slander claims of Ronnie Pack and Pack Brothers. Thus, defendants are DENIED summary judgment as to these claims.

## IV. TORTIOUS INTERFERENCE CLAIMS

{31}    During the summary judgment hearing, plaintiffs stipulated that Ronnie Pack, is not making an individual claim of tortious interference. Plaintiffs also stipulated that the corporation is not submitting a separate tortious interference claim. However, plaintiffs would like to submit evidence that supports a tortious interference claim because such evidence also supports a claim of unfair and deceptive trade practices under North Carolina's UTPA. The Court will allow plaintiffs to present evidence of acts that may have supported a tortious interference claim, and provides guidance as to those claims only insofar as they may be used for an unfair and deceptive trade practices claim. Defendants may also present evidence of defenses they believe might be applicable to a claim of tortious interference.

{32}    The Court has had the opportunity to review the standards applicable to tortious interference claims in *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.*; much of the following analysis is taken directly from that case. *See Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.*, 2002 NCBC 4 (No. 00 CVC 10358, Mecklenberg County Super. Ct. July 10, 2002) (Tennille, J.).

{33}    North Carolina recognizes actions for tortious interference that may take the form of "tortious interference with contract" or "prospective contract," but does not recognize claims for interference with "relations." *See id.* at para. {46}. A careful reading of the North Carolina Supreme Court's opinion in *Owens v. Pepsi Cola Bottling Co.* helps to clarify distinctions between the claims. *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 412 S.E.2d 636 (1992). Our Supreme Court found that "the court overlooked the principle that an action for tortious interference with prospective economic advantage may be based on conduct which prevents the making of contracts." *Sunbelt*, at para. {47} (quoting *Owens*, 330 N.C. at 680, 412 S.E.2d at 644). Our Supreme Court then used the broader category of "business relationships" to encompass the twin components of tortious interference: interference with contract and interference with prospective contract or prospective economic advantage. *Id.* Therefore, it is sufficient for a party to state a claim for interference with "relations" or "business relations" when

referring to interference with existing contracts or the prospective likelihood of future contracts. *Id.*

{34}    The North Carolina Court of Appeals has summarized the necessary elements of this action:

> An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party. *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992). In *Coleman v. Whisnant*, 225 N.C. 494, 35 S.E.2d 647 (1945), our Supreme Court stated the following:

> We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant[s'] own rights, but with design to injure the plaintiffs, or gaining some advantage at [their] expense. . . . In *Kamm v. Flink*, 113 N.J.L. 582, 99 A.L.R., 1, 175 A. 62, it was said: "Maliciously inducing a person not to enter into a contract with another, which he would otherwise have entered into, is actionable if damage results." The word "malicious" used in referring to malicious interference with formation of a contract does not import ill will, but refers to an interference with design of injury to plaintiffs or gaining some advantage at [their] expense.

> 225 N.C. at 506, 35 S.E.2d at 656. Thus, to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in "inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Cameron v. New Hanover Memorial Hospital*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917, *disc. review denied and appeal dismissed*, 307 N.C. 127, 297 S.E.2d 399 (1982).

*Walker v. Sloan*, 137 N.C. App. 387, 392-93, 529 S.E.2d 236, 241-42 (2000).

{35}    Plaintiffs have conceded that they are not presenting a tortious interference claim; thus, the Court considers defendants' summary judgment as to this claim MOOT.

## V.  FRAUD CLAIMS

{36}    During oral argument, plaintiffs conceded that the "behaviors we say constitute fraud are assumed under unfair trade practices." Thus, plaintiffs are not presenting a separate cause of action for fraud or constructive fraud and defendants' summary judgment motion is MOOT.

## VI.  COMMERCIAL DISPARAGEMENT

{37}    During oral argument, plaintiffs stated that it was not "necessary to have a separate cause of action for the commercial disparagement" as long as the same conduct can be argued under the UTPA. Thus, plaintiffs are not presenting a separate cause of action for commercial disparagement and defendants' summary judgment motion is MOOT.

## VII.  UNLAWFUL STEERING CLAIMS

{38}    Plaintiffs have stated that they do not intend to pursue a claim under North Carolina General

Statute section 58-3-180 (2001) ("Anti-Steering Statute"), thus defendants' summary judgment motion is MOOT. However, plaintiffs intend to present evidence of actions by Nationwide directed toward Pack Brothers which they claim constitute unfair practices because they violate the public policy reflected in the Anti-Steering Statute. The relevant portions of North Carolina's Anti-Steering Statute were not enacted until April 1, 2002, which is after the events giving rise to this claim. Plaintiffs further allege that Nationwide has committed acts that violate this statute after April 1, 2002. The Court has agreed to provide some guidance regarding this issue.

{39}   The North Carolina "anti-steering statute" is designed to protect consumers from activities of an insurance company that could prevent the consumer from freely choosing a repair shop. *See* N.C. GEN. STAT. § 58-3-180. The statute states:

> (b1) No insurer or insurer representative shall recommend the use of a particular motor vehicle repair service without clearly informing the claimant that (i) the claimant is under no obligation to use the recommended repair service, (ii) the claimant may use the repair service of the claimant's choice, and (iii) the amount determined by the insurer to be payable under the policy will be paid regardless of whether or not the claimant uses the recommended repair service.
>
> (b2) The provisions of subsection (b1) of this section shall be included in nonfleet private passenger motor vehicle insurance policy forms promulgated by the Bureau and approved by the Commissioner.
>
> (c) *(Effective until July 1, 2002)* Any person who violates this section is subject to the applicable provisions of G.S. 58-2-70 and G.S. 58-33-45, provided that the maximum civil penalty that can be assessed under G.S. 58-2-70(d) for a violation of this section is two thousand dollars ($ 2,000).

N.C. GEN. STAT.§ 58-3-180.

{40}   The Court believes the analysis regarding North Carolina General Statute section 58-63-15(11) contained in its October 31, 2002 Order Granting Leave to Modify Complaint as to Some Claims ("October 31, 2002 Order") is relevant to interpreting plaintiffs rights under the anti-steering statute. That language is quoted below:

> The North Carolina Supreme Court has held that violations of North Carolina General Statute section 58-63-15(11) can support a finding of unfair or deceptive acts or practices under North Carolina General Statute section 75-1.1. *Gray v. N.C. Ins. Underwriting Assoc.,* 352 N.C. 61, 69-71, 529 S.E.2d 676, 682-83 (2000); *see also Murray v. Nationwide Mutual Ins. Co.,* 123 N.C. App. 1, 472 S.E.2d 358 (1996) (finding Nationwide's violation of § 58-63-15(11) was an unfair act). However, the Unfair Claims Practices which are set forth in N.C.G.S. § 58-63-15(11) are designed to protect consumers or owners of insurance policies. *Gray,* 352 N.C. at 70-71, 529 S.E.2d at 682 ("the acts proscribed in N.C.G.S. § 58-63-15(11) were designed to protect the consuming public.") (citing *Stanley v. Moore,* 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995)). Thus, there is no cause of

action under Chapter 75 for third parties arising out of a violation of consumer policyholder's rights under section 58-63-15(11). *See Lee v. Mutual Cmty. Sav. Bank,* SSB, 136 N.C. App. 808, 525 S.E.2d 854 (2000). To the extent an auto repair shop such as Pack Brothers seeks to recover under Chapter 75-1.1, its claim must be based upon unfair or deceptive practices committed in connection with the insurance company's relationship with the repair shop, not the insurance company's relationship with its insureds. Our appellate courts have made it clear that damages under Chapter 75-1.1 must result from unfair practices that directly injure the party seeking damages. *See Pleasant Valley Promenade*, 120 N.C. App. 650, 464 S.E.2d 47; *Furr v. Fonville Morisey Realty, Inc*., 130 N.C. App. 541, 503 S.E.2d 401 (1998), *cert. dismissed*, 351 N.C. 41, 519 S.E.2d 314 (1999); *First Atl. Mgt. Corp. v. Dunlea Realty Co*., 131 N.C. App. 242, 507 S.E.2d 56 (1998)

{41}    Plaintiffs indicated at oral argument that they do not "intend to have someone come up to the witness stand and say Nationwide violated the anti-steering statute that was put into effect in North Carolina." However, the Court has denied defendants' motion in limine to exclude evidence relating to Nationwide's relationship with its policyholders with the proviso that they are free to renew it when specific evidence is offered. To the extent an auto repair shop such as Pack Brothers seeks to recover under Chapter 75-1.1, its claim must be based upon unfair or deceptive practices committed in connection with the insurance company's relationship with the repair shop, not the insurance company's relationship with its insureds.

{42}    A possible interrogatory for the jury relating to the unfair trade practice claim might look something like the following:

> Did Nationwide recommend to customers of Pack Brothers to use a different repair service without clearly informing the customer that (i) the customer was under no obligation to use the recommended repair service; (ii) the customer could use Pack Brothers if they chose to do so; and (iii) the amount determined by Nationwide to be payable under the policy would be paid whether or not the customer used Pack Brothers or the recommended repair service.

> If so, was such action taken with the intent to injure the business of Pack Brothers?

## VIII.  CLAIMS UNDER THE UNFAIR OR DECEPTIVE TRADE PRACTICES ACT

{43}    The Court next reviews plaintiffs' claim that defendants violated North Carolina's Unfair Trade Practices Act, North Carolina General Statute sections 75-1.1 through 89. The Act declares unlawful all "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. . . ." N.C. GEN. STAT. § 75-1.1. In order to establish a violation of this section, plaintiff must meet a three-pronged test: (1) there must be a showing of an unfair or deceptive act or

practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff. *First Atl. Mgmt. Corp. v. Dunlea Realty Co*., 131 N.C. App. 242, 507 S.E.2d 56 (1998); *Furr v. Fonville Morisey Realty, Inc*., 130 N.C. App. 541, 503 S.E.2d 401 (1998), *cert. denied*, 351 N.C. 41, 519 S.E.2d 314 (1999).

{44}    The statute was created to provide an additional remedy apart from those less adequate remedies afforded under common law and statutory causes of action. *See Bernard v. Central Carolina Truck Sales*, 68 N.C. App. 228, 314 S.E.2d 582, *cert. denied*, 311 N.C. 751, 321 S.E.2d 126 (1984). As a result, our courts have had the opportunity to find that if a party is able to maintain a claim for certain causes of action, a claim may also be had under Section 75-1.1. Plaintiffs' surviving defamation claims may fall within this category. *See Market Am., Inc.,* 135 N.C. App. at 156-57, 520 S.E.2d at 579-80 (1999).

{45}    As explained in preceding sections of this opinion, this court has found that plaintiff has forecast sufficient evidence to warrant those issues proceeding to trial. Therefore, in light of our appellate courts' rulings that these causes of action may also implicate violations of the UTPA, this court is not in a position to undertake the factual inquiry necessary to resolve plaintiff's Section 75-1.1 claim on this summary judgment motion.

## IX.  PUNITIVE DAMAGES

{46}    "Pursuant to our statutes, punitive damages may be awarded only if a claimant proves that the defendant is liable for compensatory damages and that the defendant is guilty of fraud, malice, or willful or wonton conduct. *Combs & Associates, Inc. v. Kennedy,* 147 N.C. App. 362, 374, 555 S.E.2d 634, 642 (2001) (citing N.C. GEN. STAT . § 1D-15(a)(1999)). As discussed above, plaintiffs have presented some evidence that they have suffered some pecuniary damage.

{47}    "Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, and managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." *Phillips v. Restaurant Management of Carolina, L.P.,*  146 N.C. App. 203, 215-16, 552 S.E.2d 686, 694 (2001) (citing N.C. GEN. STAT . § 1D-15(c) (1999)). The aggravating factors are: "(1) fraud, (2) malice, or (3) willful or wanton conduct." N.C. GEN. STAT . § 1D-15(a). Plaintiffs have presented some evidence that Nationwide managers participated in and condoned the allegedly defamatory conduct.

{48}    Defendants' motion for summary judgment regarding punitive damages is DENIED.

## X.  PACK BROTHERS PAINT AND BODY SHOP, INC.

{49}     On August 14, 2002, plaintiffs filed a motion for leave to file an amended complaint pursuant to Rule 15(a) of the North Carolina Rules of Civil Procedure. N.C. R. CIV. P. 15(a) (2001). In that motion, plaintiffs sought to correct a misnomer in the caption of the original Complaint to conform the name of the corporate plaintiff to the corporation's articles of incorporation (from "Pack Brothers Paint & Body Shop, Inc., a corporation" to "Pack Brothers Body Shop, Inc., a corporation"). Defendants contended that these were separate and distinct entities and the modification substituted a new plaintiff after the close of discovery. Defendants further argued that even if the Court allowed the amendment, it should do so without the right to relate back any claims set forth in the original Complaint. Both sides thoroughly briefed the issues for the Court. Ultimately, plaintiffs were permitted to amend the complaint to read "Pack Brothers Body Shop, Inc., a corporation."

{50}     Plaintiff's business operated as "Pack Brothers Paint and Body Shop" for twenty years. In 1991, under advice from their accountant, "Pack Brothers Paint and Body Shop" incorporated as "Pack Brothers Body Shop, Inc." but continued to operate under the name of "Pack Brothers Paint and Body Shop." "Pack Brothers Paint and Body Shop" is the partnership that owns the land upon which "Pack Brothers Body Shop, Inc." does business. A search of the North Carolina Secretary of State's web site reveals that there is no corporation named "Pack Brothers Paint and Body Shop, Inc.," nor does it list "Pack Brothers Paint and Body Shop" as a registered trade name. The Secretary of State shows "Pack Brothers Body Shop, Inc." as a valid corporation.

{51}     The original complaint listed "Pack Brothers Paint and Body Shop, Inc., a corporation" as a party. It is clear to the Court that all parties thought they were dealing with a corporation and not a partnership. Throughout the litigation, the parties have referred to "the plaintiff corporation." Defendants have conducted 30(b)(6) depositions of "Pack Brothers Paint and Body Shop," specifically referring to "a duly designated corporate representative of Pack Brothers Paint & Body Shop, Inc." Defendants have deposed nearly every employee and corporate officer of the partnership and the correct corporation. They have deposed the correct corporation's accountant. In every instance, plaintiffs and defendants may have been confused as to the correct name of the corporation; they were not, however, confused as to the identity of the plaintiff corporation. The correct identity of the corporation in question was part of matters that had appeared before in pleadings, a prior amendment, depositions, and in correspondence between the parties.

{52}     The Court reminds defendants that the partnership Pack Brothers Paint and Body Shop, Inc. is not now a party to the lawsuit. At all times, all parties understood that the corporation, Pack Brothers Body Shop, Inc., was the actual plaintiff in spite of the misnomer. Thus, there is no summary judgment to be

had as to the partnership.

## XI.  PLAINTIFFS' OBJECTION TO SUMMARY JUDGMENT MOTION FILED BY DEFENDANT BENKENDORF

{53}     In its discretion, the Court will regard the summary judgment motion filed by Mr. Benkendorf as timely.

## XII.  CONCLUSION

{54}     The court has not made any finding of fact in ruling on this motion.  It has only determined that genuine issues of material fact exist which are more appropriately determined at trial.  Nor has the court concluded that there is any liability arising from defendants' actions.  It has only determined that such determinations are best made at trial than at summary judgment.

For the reasons set forth above, it is hereby ORDERED, ADJUDGED, and DECREED that:

1.  Defendants' summary judgment motion regarding tortious interference, unlawful steering, fraud, or commercial disparagement claims are MOOT.

2.   Defendants' motion for summary judgment as to the libel *per se* claims of Pack Brothers Body Shop, Inc. and Ronnie Pack is GRANTED.

3.   Defendants' motion for summary judgment as to the libel *per quod* claims of Ronnie Pack is GRANTED.

4.   Defendants' motion for summary judgment as to the libel *per quod* claims of Pack Brothers Body Shop, Inc. is DENIED.

5.   Defendants' motion for summary judgment as to slander *per se* and *per quod* claims of Ronnie Pack and Pack Brothers Body Shop, Inc. is DENIED.

6.  Defendants' motion for summary judgment as to the UTPA claims is DENIED.

7.   Defendants' motion for summary judgment as to plaintiffs' demand for punitive damages is DENIED.

8.  Defendants' motion for summary judgment as to the claims of the partnership, Pack Brothers Paint and Body Shop, Inc. is MOOT.

This the 10th day of January 2003.

Ben F. Tennille

---

[1] Nationwide sent two other letters with very similar language. The analysis as to those letters is the same as the analysis applicable to this letter.  Plaintiffs also rest their libel *per se* claims on an elusive labor rate sheet allegedly shown by Nationwide to a customer that was also a Pack Brothers customer.  Without a writing, there is no libel.  At the hearing, plaintiff argued that spoliation may be an issue as to this rate sheet.  The Court does not find evidence in the record that would support those charges as to the rate sheet.